**PUBLIC CITIZEN HEALTH RESEARCH GROUP, et al., Plaintiffs,**

v.

**Thorne G. AUCHTER, et al., Defendants.**

**Civ. A. No. 81–2343.**

United States District Court,
District of Columbia.

Jan. 5, 1983.

David C. Vladeck, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

John D. Bates, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The plaintiffs in this proceeding are Public Citizen Health Research Group, a nonprofit organization engaged in research and advocacy on health and safety matters and the American Federation of State, County and Municipal Employees, a labor union representing employees of public and private nonprofit organizations.[1] The defend-

---

1. On December 29, 1982, an Order was entered granting leave to amend the complaint to in-

ants are officials of the United States Department of Labor charged with the responsibility of administering the Occupational Safety and Health Act of 1970 (Act), 29 U.S.C. §§ 651 et seq.

Under subsection 6(c) of the Act, the Secretary of Labor is required to issue an emergency temporary standard regulating industrial exposure to a toxic substance if he finds that employees are placed in "grave danger" from exposure to that substance and that such a standard is "necessary" to protect the employees from that danger. 29 U.S.C. § 655(c).

Because of increased health risks to exposed workers, the plaintiffs challenge a decision by Thorne G. Auchter, Administrator of the Occupational Safety and Health Administration (OSHA) refusing to issue such a standard reducing the permissible levels of worker exposure to the industrial chemical ethylene oxide (EtO). Plaintiffs assert that in light of the administrative record, Administrator Auchter and the Secretary of Labor have failed to carry out and perform their statutory duties. Specifically, they seek an order requiring the defendants to issue an emergency standard for ethylene oxide which assures "as far as possible ... healthful working conditions" under section 651 of the Act while the OSHA's permanent rulemaking responsibilities are completed.

This litigation presents the question whether the Secretary's decision, based on the record before him, was arbitrary and capricious and an abuse of discretion. The parties have filed cross motions for summary judgment on this issue. For the reasons stated below, this Court determines that the Secretary's decision was unsupported by the record and an award of summary judgment to the plaintiffs is appropriate.

clude three additional party plaintiffs. Those parties are all labor unions representing health industry workers exposed to ethylene oxide, and they are alleged to have a substantial interest in this controversy.

2. See nn. 12–13 and accompanying text.

## BACKGROUND

### The Nature and Use of Ethylene Oxide

Ethylene oxide, a gas, has a variety of uses. The substance is valuable, for example, as a sterilizing agent, fumigant, pesticide and chemical additive. It is widely used as an intermediate chemical in producing a number of industrial products including automotive antifreeze, textiles, films, bottles and detergents. Since EtO is reactive and potentially explosive, manufacturing plants which rely upon the substance typically use closed and automated systems.

EtO is regarded as a critical component of the sterilization process in the health care industry. That process generally requires its injection into sealed vessels containing objects to be sterilized. The gas is vented at the conclusion of the process. There is considerable potential for undue or excessive worker exposure to ethylene oxide during this process through the use of faulty equipment and the presence of inadequate ventilation or human error. Indeed, a study by the National Institute of Occupational Safety and Health has shown that a significant number of health care workers are exposed to the gas and many of them are exposed on a regular basis.[2]

The existing OSHA standard governing worker exposure to ethylene oxide has been in force since 1971.[3] Scientific studies of humans and laboratory animals, however, show that exposure to the gas at levels which comport with the current standard yields a significant risk of contracting cancer and chromosomal damage. Experiments with animals, for example, show an increased incidence of leukemia, abdominal cancer and mortality at exposure levels within the OSHA standard. Studies of humans whose working environments expose them to ethylene oxide show similarly elevated rates of leukemia and other cancer as

3. The standard requires employers to assure that employee exposure is not in excess of 50 parts per million of air as measured according to an eight-hour time-weighted average. 29 C.F.R. § 1910.1000; see 47 Fed.Reg. 3566 (January 26, 1982).

well as mutagenic or chromosomal abnormalities. Many hospitals and other users of the gas have voluntarily implemented measures to reduce worker exposure levels.

In late 1981, the plaintiffs petitioned OSHA seeking an emergency reduction of the current EtO standard from 50 to one part per million. The plaintiffs' request was denied. In denying the petition, Administrator Auchter concluded that the record did not support the required finding of exigent circumstances—that workers are exposed to a grave danger which, by necessity, requires immediate issuance of a standard under 29 U.S.C. § 655(c). He further noted that by virtue of its regulation of ethylene oxide as a pesticide, the Environmental Protection Agency had preempted OSHA's authority to regulate the gas. The Assistant Secretary nevertheless indicated that scientific studies suggested that a change in the current standard may be appropriate and therefore directed the implementation of rulemaking proceedings, beginning with an advance notice of proposed rulemaking (ANPR) which was subsequently published on January 26, 1982. 47 Fed. Reg. 3566.

OSHA is currently engaged in rulemaking procedures. The Department of Labor recently reported that several analyses of the EtO standard have been conducted including risk and alternative analyses. However, additional phases of agency consideration will not be completed until the fall of 1984. OSHA anticipates consideration of the notice of proposed rulemaking package during 1983 and consideration of the final rule package in late 1984. Both stages include review at the departmental level and before the Office of Management and Budget. The government has explained that the estimated 2½ year period between issuance of the ANPR and publication of a final standard is consistent with its experience in promulgating standards for other substances including lead, arsenic and cotton dust. (See Notice of Filing (October 27, 1982)).

## ANALYSIS

### A.

#### 1. The Standard of Review

■ Congress has shouldered the Courts with the responsibility of overturning agency action which is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review contemplates a searching and thorough investigation, however, administrative determinations are necessarily accorded substantial deference in recognition of an agency's expertise and competence in the areas it regulates. Courts will not substitute their judgment for that of the agency.

The standard of review is a narrow one requiring the court to determine whether the agency acted within the scope of its authority, whether the challenged decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *accord, Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) ("the agency must articulate a 'rational connection between the facts found and the choice made' "). In *Overton Park,* the Court "interpreted the arbitrary and capricious test to require a 'substantial inquiry' subjecting the agency's action to 'a thorough, probing in-depth review.' " *State Farm Mutual Auto Insurance v. Department of Transportation,* 680 F.2d 206, 219 (D.C.Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982) (agency rescission of regulations held arbitrary and capricious where decision was not supported by factual record and agency failed to duly consider alternatives).

■ OSHA's authority to establish workplace standards is derived from the Occupational Safety and Health Act which was enacted "to assure as far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651. Subsection 6(b) of the Act,

29 U.S.C. § 655(b), authorizes the Secretary to promulgate permanent health standards pursuant to rulemaking procedures similar to those embodied in the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* Acknowledging the possibility that dangerous health situations will arise necessitating the adoption of immediate remedial measures, Congress provided authority to issue emergency temporary standards pursuant to subsection 6(c), 29 U.S.C. § 655(c):

> The Secretary shall provide, without regard to [the formal rulemaking procedure required for permanent standards], for an emergency temporary standard to take immediate effect ... if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards and (B) that such emergency standard is necessary to protect employees from such danger.[4]

Emergency standards take effect immediately upon publication in the Federal Register thereby circumventing the thorough yet cumbersome rulemaking required for permanent standards. As a necessary safeguard, however, emergency standards remain effective for no more than six months and the Secretary is directed to conduct permanent rulemaking procedures within that period.[5]

In reviewing OSHA's actions in this case, it is instructive to note several cases examining the agency's authority to promulgate workplace standards under the Act. In *Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), for example, the Supreme Court struck down a permanent standard which OSHA based upon a finding of only an attenuated connection between a toxic substance and leukemia; the record was devoid of any finding that a reduced standard would actually decrease the incidence of leukemia. Emphasizing that the Act empowered the Secretary to eliminate significant harms rather than make workplaces absolutely safe, the Court alluded to decisions of two circuits as examples of the constraints imposed upon the Secretary's authority to issue emergency temporary standards. *Id.* at 651 n. 59, 100 S.Ct. at 2868 n. 59. Those cases demonstrate the standard which the Secretary must satisfy to support emergency regulations.

The Fifth Circuit vacated an emergency temporary standard in *Florida Peach Growers Association, Inc. v. U.S. Department of Labor,* 489 F.2d 120, 129 (5th Cir.1974), finding that the administrative record did not support the Secretary's implementation of section 655(c).[6] Stating that "[t]he key to the issuance of an emergency standard is the necessity to protect employees from a grave danger," *id.* at 124,[7] the Court deter-

---

4. Those findings are to be compared with those that are implicitly required by the definition of the permanent standard—(A) that there be a significant—as opposed to a "grave"—risk, and (B) that additional regulation is "reasonably necessary or appropriate" —as opposed to "necessary."
   *Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 641 n. 45, 100 S.Ct. 2844, 2863 n. 45, 65 L.Ed.2d 1010 (1980).

5. The Act also empowers OSHA with authority to adopt interim standards based on a national consensus:
   > The Secretary shall ... promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees.

29 U.S.C. § 655(a). The current ethylene oxide standard was adopted pursuant to this provision in 1971. *See* 29 C.F.R. § 1910.1000; 47 Fed.Reg. 3566 (January 26, 1982).

6. In contrast to this proceeding which does not involve rulemaking or the validity of a new standard, the two circuit court decisions applied a substantial evidence analysis as statutorily required upon review of a standard derived through rulemaking. 29 U.S.C. § 655(f).

7. The court referred to the legislative history underlying the Act to demonstrate Congress' intent to authorize the Secretary to respond quickly to certain health risks
   > if he finds that such a standard is needed to protect employees who are being exposed to grave dangers from potentially toxic materials or harmful physical agents, or from new hazards for which no applicable standard has been promulgated.

mined that the record did not contain evidence that the emergency standard was necessary although exposure to the toxic substance was acknowledged as harmful.

The Act requires determination of danger *from* exposure to harmful substances, not just a danger *of* exposure; and, not exposure to just a danger, but to a *grave* danger; and, not the necessity of just a temporary standard, but that an emergency standard is necessary.

*Id.* at 130 (emphasis in original).

Similarly, in *Dry Color Manufacturers Association v. Department of Labor,* 486 F.2d 98 (3d Cir.1973), the court vacated an emergency temporary standard where the record showed that the regulated substances posed only a *potential* cancer hazard. Thus, the court remanded the proceeding because, *inter alia,* studies of one of the substances were outdated and revealed a possible carcinogenic effect in rodents but no attributable instances of cancer in humans.[8]

■ Although the Court is unaware of any cases reviewing the denial of such a petition, the cases examining OSHA's authority to issue emergency standards demonstrate the substantial showing of grave danger and necessity which must be made before such a standard will issue. Since that showing has been made in this case the Act requires the issuance of an emergency standard.

### 2. The Sufficiency of the Record Before the Agency

■ Examination of the administrative record in this proceeding compels the conclusion that the agency's decision resulted from a clear error of judgment. The failure to issue an emergency standard could not have been based upon a proper assessment of the relevant considerations since the vast majority of the scientific studies before OSHA plainly show that workers, particularly in health care, are subjected to a grave health hazard when exposed to ethylene oxide at levels in compliance with the current standard. Despite the overwhelming administrative record favoring issuance of an emergency temporary standard, OSHA has embarked upon the least responsive course short of inaction, with the effect that the current standard will remain in place until September 1984.

Although a sufficiently grave finding of danger can be extrapolated from animal experiments, *e.g., Dry Color Manufacturers Association,* 486 F.2d at 104, OSHA was presented in this proceeding with considerable data pertaining to human as well as animal exposure. The Hogstedt Studies,[9] submitted to the Court as part of the administrative record compiled by OSHA, examined the incidence of leukemia among a sample of Swedish factory workers in one study and followed up on earlier tests of a broader sampling in a more recent study. Both found marked increases in the likelihood of developing leukemia and other cancer when exposed to ethylene oxide at levels below the current OSHA standard. One Hogstedt study noted, for example, that while three cases of leukemia were discovered among its sample of 230 employees who worked near a sterilizer for several years, the expected rate for such a group was only 0.2 (Document 90 at 1).

489 F.2d at 130 n. 16, *quoting* S.Rep. No. 1282, *91st Cong.,* 1st Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.News 5177, at 5184.

8. The purpose of subsection 6(c)(1) is to provide immediate protection in cases where there is a grave danger of harm to employees. In cases where OSHA determines that a substance is sufficiently harmful that a grave danger *would* be created by exposure, OSHA must be allowed to issue necessary regulations. In other words exposure can be assumed to be occurring at any place where there is a substance that has been determined

to be sufficiently harmful to pose a grave danger and where the regulations that have been determined to be necessary to meet that danger are not in effect.

*Id.* at 102 n. 3 (emphasis in original).

9. Hogstedt, *et al., Leukemia in Workers Exposed to Ethylene Oxide,* JAMA (1979) (Administrative Record: Document 90); Hogstedt, *et al., A Cohort Study of Mortality and Cancer Incidence in Ethylene Oxide Production Workers,* Br.J.Indust.Med. (1979) (Document 111).

Similarly, a study conducted by the American Hospital Supply Corporation [10] concluded that human exposure at levels in compliance with the current standard yields significant increases in the likelihood of chromosomal damage. An industry-sponsored effort, that study found increases in mutagenic injury among a group of approximately 100 workers exposed to ethylene oxide.

These conclusions are consistent with those of the animal studies before OSHA, including the recent Bushy Run Study [11] which found high rates of leukemia, mortality and abdominal cancer among rats. Uncontroverted scientific studies such as the MITRE Report [12] and a study by the National Institute for Occupational Safety and Health [13] point unmistakably to the conclusion that significant exposure levels still exist in the health care field.

These studies are only a sampling of the evidence before the agency, however, they are the principal studies and they are compelling. Although the government challenges the findings of the studies, suggesting that they are inconclusive or that the samples were exposed to more than one hazardous substance, the combined effect of the findings is significant—workers are exposed to EtO in significant dosages and exposure at such levels, in compliance with OSHA's standard, poses a grave health risk to those workers. Furthermore, the government has pointed to no comparable group of studies which concludes otherwise.[14]

■ The government contends that because many private institutions using EtO have voluntarily reduced exposure levels within limits which OSHA believes are "safe," it properly concluded that imposition of an emergency standard would not be necessary to protect workers. That argument is suspect. Such actions do nothing to protect those workers who are still exposed to EtO at hazardous levels or those employed at institutions which may at any time elect to withdraw the voluntary restrictions.

Of particular significance in reviewing the record is a government affidavit (dated June 28, 1982) prepared by John Martonik, Acting Director of OSHA's Directorate of

**10.** Garry, et al., Ethylene Oxide: Evidence for Human Chromosomal Effects, J. Envr. Mutagenesis (1979) (Document 45); Jorkasky (ed.), The Safe Use of Ethylene Oxide, HIMA Report No. 80–4 (1980) (Document 131); Abrahams, letter to David West, NIOSH (Document 196).

**11.** Snelling, et al., Final Report on Ethylene Oxide Two Year Inhalation Study on Rats, Bushy Run Research Center (1981) (Document 22).

**12.** Goldgraben, et al., Mitigation of Worker Exposure to Ethylene Oxide, The MITRE Corporation (Document 24).

**13.** Glaser, Special Occupational Hazard Review With Control Recommendations for the Use of Ethylene Oxide as a Sterilant in Medical Facilities, DHEW (NIOSH) Pub. No. 77–2200 (1977) (Document 35). The National Institute is authorized to conduct research and "develop and establish recommended occupational safety and health standards" to assist OSHA in its determination. 29 U.S.C. § 671.

**14.** Other studies in the record show a variety of similar results. See, e.g., Documents 20, 27, 44, 48 (studies of laboratory animals); Documents 112, 286 (risk assessments projecting the potential hazard which ethylene oxide exposure poses to humans).

In response to an inquiry by the Court, the government has submitted copies of documents which were submitted in opposition to the plaintiffs' petition. See Notice of Filing (November 8, 1982). Of the 11 documents submitted, six were brief letters or telegrams from individuals in industries which use ethylene oxide. (Documents 117, 121–25).

Of the five remaining documents, only one (Document 284) includes detailed scientific data: Document 134 (discussion prepared by the American Hospital Association regarding ethylene oxide use in hospitals and factors to be considered); Documents 136–37 (letter and response to plaintiffs' petition filed by the Ethylene Oxide Industry Council including a discussion of results of scientific studies suggesting that there is no "grave danger" at current exposure levels); Document 138 (letter from the Health Industry Manufacturers Association describing current efforts to reduce exposure and the difficulties which could be anticipated upon a change in the current standard); Document 284 (letter from a faculty member of the University of South Carolina Medical School with attachments discussing inhalation exposure in the medical industry).

Health Standards.[15] In the first paragraph of his affidavit, Martonik stated that he retained overall responsibility for all actions relating to health standards promulgation, revision, and revocation under OSHA, including any review or revision of OSHA's present standard governing employee exposure to ethylene oxide.

As indicated in the body of the affidavit, Martonik co-authored a memorandum (dated September 11, 1981) setting forth recommendations of the Health Standards Directorate for Assistant Secretary Auchter's consideration in assessing plaintiffs' petition for the emergency temporary standard. The memorandum was submitted to the Court for *in camera* inspection during a discovery dispute.[16] Describing parts of the memorandum, Martonik's affidavit mentions that the OSHA scientific advisers questioned the adequacy of the current EtO standard. He also notes some of the factors which entered into and influenced OSHA's decision. Martonik states:

> [I]n my recommendation to the Assistant Secretary, I stated my belief, based on the facts available to OSHA at that time, that the hazard posed by EtO could be adequately addressed by an expeditious rulemaking under § 6(b) of the Act culminating in a "permanent standard."

(Affidavit at ¶ 7).

A review of the document itself demonstrates that Martonik's description of the contents of the memorandum is faulty in its selectivity. Although the memorandum does recommend expeditious rulemaking, unlike its consideration of other alternatives it does not rule out the option of an emergency temporary standard. Indeed, what the affidavit fails to mention is that the memorandum recommended *either* the expeditious rulemaking referred to in the affidavit *or* the issuance of an emergency standard.

The conclusion set forth in the memorandum of the OSHA scientific advisers and the findings of the scientific studies in the record are at odds with OSHA's denial of the plaintiffs' petition. In the face of such a compelling record, to respond to the plaintiffs' petition with lengthy rulemaking which effectively leaves the current standard in place misapprehends OSHA's statutory responsibility to issue section 655(c) emergency temporary standards in appropriate circumstances in order to preserve the safety of industrial workers. OSHA's disposition of plaintiffs' petition therefore cannot withstand judicial review.

B.

█ The Court is unpersuaded by the defendant's argument that OSHA regulation of ethylene oxide usage is preempted by the Environmental Protection Agency's (EPA) authority to promulgate standards governing the use of certain pesticides under, for example, the Federal Insecticide Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq. (FIFRA).[17] That argument rests upon section 4(b)(1) of the OSHA statute, 29 U.S.C. § 653(b)(1), which provides:

15. The plaintiffs have moved to strike the affidavit, arguing that it amounts to a post-hoc agency rationalization. The Court is unwilling to grant the plaintiffs' motion, however, the plaintiffs' concerns necessarily diminish the weight which should be accorded the affidavit. *See Citizens of Overton Park v. Volpe,* 401 U.S. at 419, 91 S.Ct. at 825.

16. The "Martonik Memorandum" was the focus of an unsuccessful motion to compel submitted by the plaintiffs. The Court concluded, with the benefit of *in camera* examination, that the memorandum was a privileged intergovernmental communication which was predecisional in nature. (Order of May 20, 1982). The plaintiffs renewed their motion to compel disclosure of the memorandum in light of the Martonik Affidavit's reliance on parts of the document. The Court concludes that the portion of the memorandum which states the authors' recommendations should now be released in light of the government's reliance on that segment and the Martonik Affidavit's selective description of its contents.

17. *See, e.g.,* Worker Protection Standards for Agricultural Pesticides, 40 C.F.R. Part 170, §§ 170.1–170.5. Section 170.1 indicates that the regulation

> contains occupational safety and health standards for *farmworkers performing hand labor operations in fields* after ground (other than those incorporated into the soil), aerial or other type of application of pesticides (emphasis supplied).

Nothing in this chapter shall apply to working conditions of employees with regard to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

The defendants assert that section 4(b)(1) forecloses OSHA regulation of any substance regulated by EPA. They believe that the provision is triggered by the mere exercise of EPA's regulatory authority over a toxic substance; an EPA regulation, according to the government, preempts OSHA's authority whether consistent or inconsistent with an OSHA standard. Although the section clearly preempts OSHA regulations in certain instances, the provision should not be read as broadly as the defendants suggest.

It is clear that Congress attached great importance to the safety and health protections of employees afforded by OSHA and, in particular, to the desirability of bringing those protections to bear upon employees generally as fast as possible. The legislative scheme, in furtherance of this objective, was to apply OSHA forthwith across the board, but to provide that regulation *might be preempted by other agencies with comparable authority over particular industries.*

*Baltimore and Ohio Railroad Co. v. Occupational Safety and Health Review Commission,* 179 U.S.App.D.C. 97, 548 F.2d 1052, 1054 (1976) (per curiam) (emphasis supplied). The court declined to apply the preemption provision in that case despite regulatory activity by the Federal Railroad Administration. Specifically, it refused to conclude that the preemption provision is triggered either upon a showing that a given industry is subject to regulation by another agency or upon the mere exercise of such authority even in a limited manner. *Id.* at 1053–54.[18]

In this case, the defendants contend that OSHA, despite a decade of regulatory enforcement[19] of its own ethylene oxide standard, has acted in contravention of section 4(b)(1) in light of EPA's pesticide enforcement scheme. Indeed, EPA has suggested that regulatory inquiries into the protection of hospital and industrial workers from ethylene oxide exposure fall within the purview of several agencies including OSHA. (*See* Document 183.) Although OSHA has omitted itself to further regulatory activity in the area—including over two years of administrative rulemaking and deliberation—OSHA now suggests that its efforts may be in error in light of section 4(b)(1).

The Court concludes that section 4(b)(1) does not preclude OSHA from issuing a permanent or an emergency temporary standard regulating worker exposure to ethylene oxide in those areas—such as the health care industry—where EPA has apparently exercised minimal, if any, regulatory authority in an overlapping manner.

### C.

In sum, OSHA's decision denying the plaintiffs' petition for an emergency standard cannot withstand the "thorough, probing, in-depth" scrutiny required under the Administrative Procedure Act. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 415, 91 S.Ct. at 823. The record

18. OSHA's authority has been preempted by EPA regulatory activity under section 4(b)(1) where OSHA sought to issue and enforce a broad standard embracing 21 farming pesticides. *Organized Migrants in Community Action, Inc. v. Brennan,* 172 U.S.App.D.C. 147, 520 F.2d 1161, 1167 (1975).

While giving the Secretary omnibus authority to regulate occupational safety and health, Congress sought to avoid the wasteful duplication that would result where another federal agency was also providing for the occupational safety of a class of workers.

*Id.* at 1167. The Court left open the issue of parallel agency regulation and enforcement as to nonoverlapping regulations, *id.* at 1170 n. 11, but clarified its position in *Baltimore and Ohio,* 548 F.2d at 1053–54.

19. Document 211, for example, is a computer printout listing the numerous OSHA inspections and citations in recent years which have dealt with exposure to regulated toxic substances including ethylene oxide. *See also,* Documents 131, 134, 204.

before the agency presented a solid and certain foundation showing that workers are subjected to grave health dangers from exposure to ethylene oxide at levels within the currently permissible range. An immediate adjustment in the existing standard is necessary to protect those workers. Given the record, the decision of the agency to deny the petition and implement a procedure which insured the continuing existence of the challenged standard constitutes an abuse of discretion. In addition, OSHA's authority to regulate exposure to ethylene oxide is not preempted in its entirety under section 4(b)(1) by EPA's regulatory activity.

An appropriate order will be entered.

### ORDER

For the reasons set forth in the Memorandum Opinion filed on this date, it is by the Court this 5th day of January 1983,

### ORDERED

That the defendants' motion for summary judgment is denied; the plaintiffs' motion for summary judgment is granted; and, judgment is entered for the plaintiffs.

That the Occupational Safety and Health Administration of the Department of Labor shall promulgate within 20 days from this date an appropriate emergency temporary standard addressing worker exposure to ethylene oxide, consistent with the Memorandum Opinion of the Court. The defendants shall report their results to the Court on or before January 31, 1983.