AMERICAN FEDERATION OF LA-BOR & CONGRESS OF INDUSTRI-AL ORGANIZATIONS and Industrial Union Department, AFL–CIO, Petitioners,

v.

Peter J. BRENNAN, Secretary of Labor, et al., Respondents,

Chamber of Commerce of the United States and American Metal Stamping Association, Intervenors.

No. 75–1105.

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1975.

Decided Dec. 31, 1975.

J. Albert Woll, Robert C. Mayer, George H. Cohen, Robert M. Weinberg, Bredhoff, Cushman, Gottesman & Cohen, Laurence S. Gold, Washington, D. C., for petitioners.

William J. Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Michael H. Levin, Counsel for Appellate Litigation, Judith A. Burghardt, Richard T. Galgay, Attys., U. S. Dept. of Labor, Washington, D. C., for respondents.

Vincent J. Apruzzese, of counsel; Maurice J. Nelligan, Jr., Springfield, N. J., on the brief; Apruzzese & McDermott, A Professional Corp., Springfield,

N. J., for intervenors, Chamber of Commerce of the United States and American Metal Stamping Assn.

John S. Koch, Jonathan M. Weisgall, Covington & Burling, Washington, D. C., for National Machine Tool Builders Ass'n, amicus curiae.

Charles E. Cooney, Jr., Syracuse, N. Y., of counsel; Costello, Cooney & Fearon, Syracuse, N. Y., for Associated Industries of New York State, Inc., amicus curiae on behalf of respondents Peter J. Brennan, and others.

Before BIGGS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The American Federation of Labor and Congress of Industrial Organizations and the Industrial Union Department, AFL–CIO (Petitioners), by a petition filed pursuant to § 6(f) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 655(f), challenge the action of the Secretary of Labor (the Secretary) in promulgating on December 3, 1974 a revision of the safety standards applicable to mechanical power presses. The Secretary as respondent, and two intervenors, the Chamber of Commerce of the United States and the American Metal Stamping Association, defend the revised standards, as does the Associated Industries of New York State, Inc. as amicus. The

National Machine Tool Builders Association as amicus supports the petitioner's challenge. At issue is the Secretary's decision to eliminate the "no hands in dies" standard for mechanical power presses, adopted in 1971 and appearing at 29 C.F.R. § 1910.217(d)(1)–(2) (1974).

In § 6(a) of the Act the Secretary was authorized and directed to promulgate by rule as an occupational safety and health standard any "national consensus standard" unless he determined that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. 29 U.S.C. § 655(a). "National consensus standard" is defined in § 3(9) of the Act as one adopted and promulgated by a nationally recognized standards-producing organization.[1] In 1971 the Secretary, acting pursuant to § 6(a), adopted a large number of standards which had been promulgated by the American National Standards Institute, Inc. (ANSI), an organization which has served as a clearinghouse for the development of voluntary standards by agreement among maker, seller and user groups.[2] Among the ANSI standards which the Secretary adopted was its standard B 11.1–1971, Safety Requirements for the Construction, Care and Use of Mechanical Power Presses. This standard was a revision of a safety code for mechanical power presses which had first been promulgated in 1922 and had

1. § 3(9) of the Act, 29 U.S.C. § 652(9), provides:

"For the purpose of this chapter—

. . . . .

(9) the term 'national consensus standard' means any occupational safety and health standard or modification thereof which (1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies."

2. The American National Standards Institute is one of two private organizations which formulate consensus standards for commerce and industry. The other is the National Fire Protection Association. It is clear that the drafters of OSHA contemplated that the standards of these two organizations would provide the vehicle for the Secretary's adoption of national consensus standards under § 6(a). See S.Rep. No.91–1282, 91st Cong., 2d Sess. 6, 1970 U.S. Code Cong. & Admin.News 5177, 5182; 116 Cong.Rec. 38373 (1970) (remarks of Representative Steiger); 36 Fed.Reg. 10466 (1971) (statement of Secretary of Labor Hodgson in promulgating an extensive series of national consensus standards).

been revised several times thereafter. Standard B 11.1–1971, a revision adopted by ANSI on February 17, 1971, however, although it carried forward many features of the earlier mechanical power press safety codes, departed radically from those codes in one very significant respect. The 1971 standard announced its central purpose to be the elimination of "the necessity of having the operator place his hands or fingers within the point of operation, thus minimizing his exposure to point of operations hazards."[3] When it promulgated the no

hands in dies standard[4] the B 11 standards committee did not anticipate that its code would, by virtue of the enactment of OSHA and the Secretary's action, become a mandatory federal standard rather than a precatory guideline for the affected industries.[5]

On January 26, 1973 the Secretary announced in the Federal Register the receipt of two petitions[6] to revoke 29 C.F.R. § 1910.217(d)(1)–(2). The announcement disclosed:

---

3. American National Standards Institute, "American National Standard Safety Requirements for the Construction, Care and Use of Mechanical Power Presses," Foreword (1971) (Pet.App. at 3).

The incidence of power press-related injuries has reached intolerable levels. The American Metal Stamping Association, a trade association of employers who use power presses, has estimated that 3 out of every 500 workers who operate power presses will suffer a point of operation injury (caused by the *die*, the tooling used in a press for cutting or forming material). It is further estimated that over a 30-year period 1 in every 5 power press operators will suffer a debilitating injury, often amputation of a hand or a portion of a hand. *See* letter from National Machine Tool Builders Association to OSHA, Pet.App. at 199. The no hands in dies standard is an innovative response to the urgent problem of workplace injury.

4. The key provisions of Standard B 11.1 appear at 29 C.F.R. § 1910.217(d)(1)–(2) (1974):

(d) *Design, construction, setting, and feeding of dies*—(1) General requirements. It shall be the responsibility of the employer to institute die procurement, construction and modification policies and procedures that will eliminate by August 31, 1974, the need for the operator to place his hands or fingers within the point of operation. Effective August 31, 1974, the employer shall:

(i) Use dies designed and constructed to eliminate hazards to operating personnel.

(ii) Furnish and enforce the use of a handtool specifically designed for the purpose of freeing and/or removing stuck work or scrap pieces from the die to avoid requiring the operator to place his hands or fingers within the point of operation, and

(iii) Furnish and enforce the use of hand feeding tools when necessary with manual feeding methods to avoid requiring the operator to place his hands or fingers within the point of operation.

(2) *Ejecting stock and scrap.* (i) Dies shall be designed to permit use of press

knockouts and lower liftouts where the press is so equipped.

5. Prior to adoption of the no hands in dies standard, the ANSI had last updated the power press safety code in 1960. Work on a revision began in 1965 and culminated in the near-unanimous approval of the B 11.1 standard in February, 1971. (Pet.App. at 415). Preliminary work on the new standard antedated OSHA, and its approval was nearly contemporaneous with the Act's passage.

In 1973, pursuant to a request from the Secretary of Labor, ANSI's B 11 committee agreed to reconsider its no hands in dies standard. Several drafts have been prepared but presently the committee is in a position where it can neither obtain consensus on a revision nor reaffirm the no hands in dies standard. As the intervenor observes, "[t]oday the [national consensus] standard is with us; only the concensus [sic] is missing." Brief of Chamber of Commerce of the United States and American Metal Stamping Association at 23–24.

The intervenors argue that because the no hands in dies standard is no longer supported by a consensus, revocation by the Secretary is appropriate. But the B 11.1 standard remains as the last statement of ANSI, so the procedural formalities outlined in § 6(b)(8) of the Act, 29 U.S.C. § 655(b)(8), must be observed.

Furthermore, § 6(f), 29 U.S.C. § 655(f), requires that a petition to review a new standard be filed within 60 days of promulgation. A petition for review would have been the appropriate vehicle for challenging the claimed consensus for any national standard. Since no timely petition was filed in this case, we are foreclosed from considering the issue on this appeal. *See Associated Indus. v. United States Dept. of Labor*, 487 F.2d 342, 350–51 (2d Cir. 1973).

6. One petition was filed by the Chamber of Commerce of the United States and the other was filed by the Organization Resources Counselors.

A major contention of the petitioners is that the point of operation guards or point of operation devices required by 29 CFR 1910.217(c) adequately protect an operator of a mechanical power press from an injury that could result from his hands being placed at the point of operation of the press. Since the guards or devices are designed to prevent either an operator's hands or fingers from entering the area at the point of operation or the stroking of the press, it is contended that the design and construction requirements for mechanical power presses in 29 CFR 1910.217(d)(1) and (2) would serve the same purpose and provide substantially the same protection. Hence petitioners argue that these provisions require great expenditures without adding significant protection.

38 Fed.Reg. 2465(1973). The Secretary invited comments on the proposed action by February 24, 1973.

The point made in the petitions for revocation was that ANSI Standard B 11.1–1971 provided for redundant safeguards against the hazard of injury to the operator's hands during the power stroke of a mechanical press. Section (c)(1), 29 C.F.R. § 1910.217(c)(1)(i) provided that "[i]t shall be the responsibility of the employer to provide and insure the usage of 'point of operation guards' or properly applied and adjusted point of operation devices on every operation per-

formed on a mechanical power press." Guards or fixed barriers are intended to prevent the entry of hands or fingers into the point of operation during the power stroke of the press.[7] Devices are intended to prevent or interrupt the power stroke of the press if the operator's hands are in the point of operation, or to prevent the operator from placing his hands in the point of operation during the power stroke by requiring that they be elsewhere.[8] What the original section (d)(1) required, in addition to mechanical safeguarding, was that the operator's hands remain outside the die not only during the power stroke cycle of the press but also during the feeding cycle. Thus the effect of section (d)(1) was to prevent hand feeding of any mechanical press. Feeding under standard (d)(1) could be accomplished only by automatic or semiautomatic feeding, or by the use of hand tools.

On March 14, 1974 the Secretary gave notice of proposed modifications of the mechanical power press regulations. The notice proposed tightened standards relating to guards and devices,[9] but also proposed the elimination of the no hands in dies requirement.[10] The notice fixed May 13, 1974 as the date upon which a public hearing on the proposed rulemaking would commence.[11]

Thirty-three interested parties appeared and testified at the hearing, including representatives of the Chamber of Commerce, the American Metal

---

7. 29 C.F.R. § 1910.211(d)(32). In theory guards provide the maximum of safety by preventing the operator from placing his hands in the point of operation even when the power press is not cycling.

8. Id. § 1910.211(d)(11). A wide variety of devices have been used on mechanical presses, with varying degrees of success. A two-hand control device requires the operator to apply concurrent pressure on two trip switches that activate the press power stroke. Id. § 1910.-211(d)(17). A pull-out device is a mechanical attachment that automatically withdraws the operator's hands from the point of operation during the power stroke. Id. § 1910.-211(d)(15). A presence-sensing device is a light curtain shielding the point of operation that interrupts the power stroke when penetrated. Id. § 1910.211(d)(12). A sweep device

is a rod that clears the operator's hands from the point of operation during the power stroke. Id. § 1910.211(d)(16).

9. The amended regulations placed principal emphasis upon revised standards of control system reliability and brake monitoring. See 39 Fed.Reg. 9838–39 (1974). In addition the Secretary, deeming the sweep device ineffectual, prohibited its use after December 31, 1976. 29 C.F.R. § 1910.217(c)(3)(v), 39 Fed.Reg. 41847 (1974).

10. "The requirement for 'no hands in dies' prescribed in § 1910.217(d)(1) would be revoked and a performance type regulation would replace it." 39 Fed.Reg. 9839 (1974).

11. Pursuant to § 6(b)(3) of the Act, 29 U.S.C. § 655(b)(3).

Stamping Association, several large corporate power press users, the UAW and the AFL-CIO. Labor representatives uniformly opposed at this hearing revocation of the no hands in dies standard, as did manufacturers of mechanical power presses. Both groups heavily relied upon statistical evidence to strengthen the case against revocation. Industrial users of power presses uniformly supported the Secretary's proposed action. In addition to oral testimony the Secretary received over 300 written comments and 90 hearing exhibits. The rulemaking proceedings were closed on June 26, 1974.

On December 3, 1974 the Secretary adopted the final power press standard substantially in the form proposed in his March 14, 1974 notice.[12] Pursuant to § 6(b)(8) of the Act, 29 U.S.C. § 655(b)(8), the Secretary published a statement of reasons describing why the rule as adopted would better effectuate the purposes of OSHA than the national consensus standard it supplanted. The significant parts of that statement are quoted in Part II of this opinion.[13] The petitioner seeks review of the December 3, 1974 action.

## I.  SCOPE OF REVIEW

In *Synthetic Organic Chemical Manufacturers Association v. Brennan*, 503 F.2d 1155 (3d Cir. 1974), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975) (*Synthetic Organic I*), we outlined

the five-step process under § 6(f) that we will follow in reviewing the Secretary's action in promulgating a permanent safety standard.[14]  The petitioner contends that in this instance the scope of our review is far less circumscribed than under § 6(f), which provides that "determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole."  It points to § 6(b)(8) of the Act, 29 U.S.C. § 655(b)(8):

> Whenever a rule promulgated by the Secretary differs substantially from an existing national consensus standard, the Secretary shall, at the same time, publish in the Federal Register a statement of the reasons why the rule as adopted will better effectuate the purposes of this chapter than the national consensus standard.

From this language the petitioner reasons that whenever the Secretary departs from a national consensus standard his rulemaking is deprived of the presumption of validity afforded by § 6(f), and he must satisfy us, by factfinding supported by evidence, that the departure from the consensus will better effectuate the purposes of the Act. Thus we must initially determine whether to review the administrative action by the standards announced in *Synthetic Organic I* or by a stricter standard.

At the outset we note that petitioners' position with respect to the proper interpretation of § 6(b)(8) is a two-edged

---

**12.** The revised standard (d) provides:

   (d) *Design, construction, setting and feeding of dies.* (1) General requirements. Effective February 1, 1975, the employer shall: (i) use dies and operating methods designed to control or eliminate hazards to operating personnel, and (ii) furnish and enforce the use of hand tools for freeing and removing stuck work or scrap pieces from the die, so that no employee need reach into the point of operation for such purposes.

   (2) [Revoked]

29 C.F.R. § 1910.217(d), 39 Fed.Reg. 41848 (1974).

**13.** *See* note 23 *infra.*

**14.** We said that at a minimum, our appellate duties consist of:

(1) determining whether the Secretary's notice of proposed rule making adequately informed interested persons of the action taken;

(2) determining whether the Secretary's promulgation adequately sets forth reasons for his action;

(3) determining whether the statement of reasons reflects consideration of factors relevant under the statute;

(4) determining whether presently available alternatives were at least considered; and

(5) if the Secretary's determination is based in whole or in part on factual matters, subject to evidentiary development, whether substantial evidence in the record as a whole supports the determination.

503 F.2d at 1160.

sword. In this instance the departure from a national consensus standard involves the elimination of a redundant safety requirement, the retention of which arguably would enhance employee safety. But petitioner's interpretation of § 6(b)(8) would impose on the Secretary the same burden of proof in those instances where he concluded that it was desirable and feasible to modify an existing national consensus standard by proposing new and more rigorous health and safety requirements. There are literally hundreds of national consensus standards.[15] Many of these represent only the lowest common denominator of sharply-divided opinion;[16] others represent a state of the art which does not take into account emerging developments in the technology of safety, or in the field of health science.[17] Congress made unmistakably clear its intention that national consensus standards should constantly be upgraded to reflect advances in science and technology.[18] Adoption of privately promulgated national consensus standards was viewed as an interim measure, to provide uniform minimum national standards pending plenary action by the Secretary.[19]

In the context of upgrading national consensus standards—especially those relating to chemical processing, where we are now only on the frontier of scientific understanding and recognition of the multitude of latent health hazards that exist[20]—imposing on the Secretary the burden of proof suggested by petitioners would have major consequences not necessarily consistent with the remedial purpose of OSHA. Experimentation, extrapolation and prognostication may suggest various conclusions, the correctness of which is not likely to be susceptible of easy resolution. Saddling the Secretary with the burden of proving to our satisfaction the scientific superiority of every

**15.** In early 1971, shortly after OSHA became law, the Secretary of Labor, pursuant to authority granted him in § 6(a) of the Act, 29 U.S.C. § 655(a), promulgated as federal standards an extensive package of private consensus codes. *See* 36 Fed.Reg. 10466–10714 (1971). The speed with which the federal standards were adopted precluded mature consideration of their merits by OSHA. The power press standard is illustrative: adopted by ANSI on February 17, 1971, it was adopted by the Secretary as a national consensus standard on May 29, 1971.

**16.** *See, e. g.,* note 5 *supra.*

**17.** *See, e. g., Society of the Plastics Indus., Inc. v. OSHA*, 509 F.2d 1301 (2d Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975) (challenge to toxic substances standard enacted in response to newly-discovered health hazard posed by vinyl chloride); *Dry Color Mfrs'. Ass'n Inc. v. Department of Labor*, 486 F.2d 98 (3d Cir. 1973) (challenge to temporary emergency standard promulgated after discovery of carcinogenic properties of industrial chemicals).

**18.** S.Rep.No.91–1282, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News 5182–83 says:

The purpose of this procedure is to establish as rapidly as possible national occupational safety and health standards with which industry is familiar. These standards may not be as effective or as up-to-date as is desirable, but they will be useful for immediately providing a nationwide minimum level of health and safety.

.   .   .   .   .

Promulgation, Revision and Revocation of Standards—The consensus and other standards issued under section 6(a) would provide a sound foundation for a national safety and health program. However, as a recent Department of Labor study has shown, a large proportion of the voluntary standards are seriously out-of-date. Many represent merely the lowest common denominator of acceptance by interested private groups. Accordingly, it is essential that such standards be constantly improved and replaced as new knowledge and techniques are developed. In addition, there are many occupational hazards—particularly those affecting health—which are not covered by any standards at all. Section 6(b) sets forth the procedures by which the promulgation of new standards, and the revision and revocation of adopted standards, are to be accomplished.

**19.** *See id.*

**20.** *See* cases cited in note 17 *supra*; *Industrial Union Dept., AFL-CIO v. Hodgson*, 162 U.S. App.D.C. 331, 499 F.2d 467 (1974) (asbestos standard); *Florida Peach Growers Ass'n, Inc. v. United States Dept. of Labor*, 489 F.2d 120 (5th Cir. 1974) (carcinogenic properties of pesticides).

departure from a national consensus standard—a burden which in many instances he cannot meet—might well in the long run compromise the cause of safety in the workshop. In *Synthetic Organic I* we pointed out the difficulty of attempting to measure a legislative policy decision against a merely factual yardstick.[21] The difficulty remains, as does our lament, whether the standard under review supplants a national consensus standard or is wholly new.

Of course, where Congress has made clear its intention that factual determinations are a condition precedent to rulemaking, we have enforced the congressional mandate. For example, § 6(c)(1) of the Act, 29 U.S.C. § 655(c)(1), requires that the Secretary, before promulgating an emergency temporary health and safety standard, determine (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, and (B) that an emergency standard is necessary to protect them from such danger. In *Dry Color Manufacturers' Association Inc. v. Department of Labor*, 486 F.2d 98, 102 (3d Cir. 1973) we held that an emergency temporary standard would be set aside unless both findings were made and were supported by substantial evidence. Thus if in § 6(b)(8) Congress clearly intended to impose on the Secretary a higher burden of proof, or to require of us a more stringent standard of judicial review than would otherwise apply to a safety standard, we would be bound to act accordingly.

■ But we find no such clear expression of congressional intention. In the first place the language of § 6(b)(8) speaks in terms of a statement of reasons, not in terms of factual support for those reasons. The language of § 6(b)(8) is thus more directly related to the generally applicable statement of reasons requirement contained in § 6(e) than to the generally applicable evidentiary standard requirement of § 6(f). *Compare* § 6(c)(1). We conclude that the purposes of the Act, considered together with the statutory language Congress chose to express that purpose, support the Secretary's statement of the standard of review applicable in this case.

We recognize, of course, that ordinary rules of statutory construction may be eclipsed by a clear and unmistakable declaration of intent in the legislative history.[22] But we do not believe that petitioner can take great comfort in the legislative history of § 6(b)(8). In fact, our review of the sparse legislative history of that provision only fortifies our conviction that the Secretary has correctly read the statute.

S.2193, the bill which ultimately became OSHA, was reported from the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare without any § 6(b)(8). This section was added to the bill by way of amendment on November 17, 1970. The sponsor of the amendment was Senator Javits, who had introduced a parallel administration bill, and who had sponsored several other amendments to S.2193. His explanation of the amendment's purpose is quoted in the margin.[23] Petitioners would have us

---

21. 503 F.2d at 1158.

22. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

23. "We have under this amendment, the concept of a statement which will help us better to enforce the law where a deviation from an existing national consensus standard is promulgated by the Secretary.

A national consensus standard, under this act, is a standard which has been developed by one or two organizations at the present time: The American National Standards Institute or the Fire Underwriters Association.

In the first place, this amendment ought to be adopted so that the people will have an explanation of why the Secretary is doing what he is doing.

The other aspect of the matter is that the bill provides for a National Institute of Occupational Health and Safety, and it is important to assure these outside organizations, which are very important in this field, that the Institute is not designed in any way to preempt or limit the activity or importance

hold that the remarks, and particularly the first paragraph, plainly manifest a congressional intent to require the Secretary to establish that a revised health and safety standard "will better effectuate the purposes" of OSHA. We believe the key language is contained in the third paragraph: "this amendment ought to be adopted so that the people will have an explanation of why the Secretary is doing what he is doing." The purpose of § 6(b)(8) is to require the Secretary to make particular reference to his reasons for rejecting the consensus standard as well as stating his reasons for adopting his own standard.

■ Although § 6(e) of the Act imposes a general obligation upon the Secretary to state the reasons for any action. he has taken with respect to any health and safety standard,[24] the scope of § 6(e) is not necessarily co-extensive with that of § 6(b)(8). Before he may adopt *any* standard the Secretary must, under the former provision, state reasons demonstrating that he has given consideration to factors relevant under the statute.[25] But if his standard differs substantially

from an existing national consensus standard he must go further, and attempt to show as well what reasons there are for the departure. If the reasons for the departure are based in whole or in part on factual matters susceptible of evidentiary development, they must, as in any other case, be supported by substantial evidence in the record as a whole.

We conclude, then, that § 6(b)(8) is no more than a particularization of the general statement of reasons requirement of § 6(e), and that whether or not a permanent standard differs substantially from an existing national consensus standard, the Secretary's promulgation of such a standard is reviewable in the manner outlined in *Synthetic Organic I.*

## II. VALIDITY OF THE REVOCATION OF THE NO HANDS IN DIES STANDARD.

The Secretary's statement of reasons for revoking the no hands in dies standard is set forth in the margin.[26] The

of national consensus organizations such as the American National Standards Institute.
These organizations have made valuable contributions in this field in the past, and I hope they will continue to do so in the future. This is so that they may be reassured that the Institute represents no threat to them.

The other point I should like to make with respect to reassuring these organizations is to confirm the fact that it is expected that the director of the new Institute will take full advantage of the extensive expertise represented by members of technical societies and private standards development organizations which serve an important purpose and which should continue to function in the private sector of occupational health and safety."
116 Cong.Rec. 37623 (1970).

**24.** § 6(e) of the Act, 29 U.S.C. § 655(e), says:
Whenever the Secretary promulgates any standard, makes any rule, order, or decision, grants any exemption or extension of time, or compromises, mitigates, or settles any penalty assessed under this chapter, he shall include a statement of the reasons for such action, which shall be published in the Federal Register.

**25.** *Synthetic Organic I, supra,* 503 F.2d at 1160; *Associated Indus. v. United States Dep't of Labor,* 487 F.2d 342 (2d Cir. 1973).

**26.** Initially, it should be noted that the current § 1910.217(d)(1) would merely require the employer to institute die procurement, construction and modification policies and procedures to eliminate the need for employees to place their hands or fingers in the point of operation. This requirement would not have prohibited or prevented employees from actually placing their hands in the point of operation. Indeed, point of operation injuries occur where "no hands in dies" is in effect (Tr. 513, 669–70, Exhibits 83–85).

The accident statistics are not helpful in determining the effectiveness of "no hands in dies" when compared with appropriate safety devices or guards. At most, the Liberty Mutual Statistics seem to suggest that appropriate guards or devices were not required by law when those accidents occurred.

Moreover, many employers have shown that methods other than "no hands in dies" provide adequate safety at the point of operation (see e. g. Tr. 85, 119, 151, 295, Ex. 56). Most of these "hands in dies" safety devices have been incorporated into the final rule, and will be discussed below.

petitioner does not urge that the modification was adopted after inadequate notice, or that the Secretary neglected to consider presently available alternatives.[27] Petitioner does urge (A) that the reasons set forth by the Secretary are not supported by substantial evidence, (B) that some of the reasons relied on are not relevant under the Act, and (C) that the statement of reasons is generally inadequate to support the action taken. Because *Synthetic Organic I* establishes this court's competence to hear objections of this nature to the Secretary's action, we now turn to the merits of petitioner's arguments.

### (A) *The substantial evidence contention*

In addressing this objection we will review the Secretary's reasons (which we paraphrase) seriatim.

(1) *The no hands in dies standard would not prevent employees from*

> In addition to the potential for point of operation injuries which exists even with "no hands in dies," additional hazards are created in "no hands in dies" operations. Thus, serious additional pinch points are created by feeding apparatus (see e.g. Tr. 201–5, 318, 513). And, for example, where feeding robots are used, employees may be exposed to additional hazards (Tr. 510).
>
> Technologically, "no hands in dies" does not appear to be universally possible in the near future. Several employers indicated that they have tried to implement "no hands in dies" operations in their plants, and while some success has been achieved, they have been unable to attain "no hands in dies" in certain operations (Tr. 171, 489). A manufacturer also indicated that he has conducted surveys at the requests of employers to determine the feasibility of "no hands in dies" in their plants, and in many instances has concluded that technology does not permit this type of operation (Tr. 416, 480). Therefore, it clearly appears that a universal requirement of "no hands in dies" would be infeasible.
>
> We also believe that the costs associated with attaining "no hands in dies" are prohibitive. The record evidence contains the following estimated costs: press modification —$1,500–$35,000 per press (Tr. 58, 89, 412, 546); loading and unloading equipment— 10–15 percent of the cost of the press (Tr. 264); modification of existing tools and dies, where feasible—$180 per die (Tr. 120); new

*actually placing their hands in the point of operation.*

According to the record evidence the effectiveness of a no hands in dies standard depends, in large measure, upon the voluntary cooperation of individual employees. Unlike guards or devices, the no hands in dies standard does not actually prevent the press operator from putting his hands in the point of operation. Many power press workers are paid at piece rates, and there is evidence that compliance with the standard will frequently result in a marked decrease in productivity.[28] The evidence also suggests that the natural human tendency to take short cuts to increase productivity will produce evasion of a no hands in dies regulation. In addition, hands will be placed in the point of operation to clear stuck work or correct a malfunction. This determination by the Secretary is supported by substantial evidence.

> dies—12–25 percent over the cost of hand fed dies (Tr. 77). Moreover a significant number of presses, tools and dies may become obsolete. And the additional space demands resulting from automated or semi-automated feeding and part removal devices— in some cases as much as 20 percent (Tr. 273)—may require employers to reduce the number of operational presses or acquire additional space. Finally, the engineering costs of designing and instituting "no hands in dies" are also substantial (Exh. 63).
>
> It has further been suggested, and we agree that the costs of instituting "no hands in dies" would make many short production runs economically infeasible (Tr. 56, 61, 130, 503). It appears that some production lines would be discontinued if "no hands in dies" were required because the additional overhead costs would, in some instances, be prohibitive.
>
> For the above reasons, we have revoked the requirement of "no hands in dies".
> 39 Fed.Reg. 41842–43 (1974).

27. That the Secretary is modifying an existing health and safety standard (as opposed to promulgating one de novo) necessarily implies consideration of at least one presently available alternative (i. e., the pre-existing standard).

28. For example, in a written response to OSHA's proposed rulemaking, Honeywell reported that in one test the use of hand tool feeding reduced productivity by 50%. *See* Pet.App. at 190–91.

(2) *Accident statistics are not helpful in determining the effectiveness of "no hands in dies" when compared with appropriate safety devices and guards.*

Evidence of the effectiveness of various power press safety plans was of two varieties: (1) written comments and oral testimony, and (2) a 1969 Liberty Mutual Insurance Company Study of 389 power press accidents.[29] We believe that the record amply supports the Secretary's position that the written comments and oral testimony were inconclusive on the issue of the relative safety of the no hands in dies standard in comparison with safety devices and guards.[30] And although the Liberty Mutual Insurance Company Study does suggest that no hands in dies may provide greater safety than some kinds of safety guards and devices,[31] we do not believe this study supports the inference that no hands in dies is likely to provide a greater degree of safety than the Secretary's revised regulation.[32] We therefore conclude that the Secretary's determination is supported by substantial evidence. Whether such a comparison is relevant under OSHA is a matter discussed below in Part IIC.

(3) *Safety methods other than no hands in dies provide adequate employee protection at the point of operation.*

Comments and testimony of many power press employees suggest that power presses which permit manual feeding —"hands in dies"—can by guards and safety devices be made virtually accident proof.[33] The Secretary points out that the proven features of these guards and devices have been incorporated into his final safety standard. Certainly his determination that they are effective is

---

**29.** Hart, "Power Press Accidents—A Management Problem," Metal Stamping, July, 1969, at 16–18.

**30.** Some industrial users of mechanical power presses reported outstanding safety records with machines equipped with safety guards and devices. Honeywell reported that in 12 years it had operated 2 million hand-fed machine hours without a point of operation injury. (Pet.App. at 182). Organization Resources Counselors commented that its members suffered one accident in 20 years and 3.88 million hours of operation. (*Id.* at 217). Wiremold Company said that over 14 years and 3.19 billion press strokes it experienced no point of operation injuries. (*Id.* at 102, 471–72).

Several proponents of the no hands in dies standard testified that such a standard would better protect employees than guards and devices, but this was opinion evidence without statistical substantiation.

**31.** The Liberty Mutual Insurance Company Study involved an examination of the causes of 389 non-random power press accidents. The study categorized accidents according to the type of operator protection provided at the time of the injury. The accidents studied were distributed among the various categories as follows:

| Type of Guarding | Accidents | Percent of Accidents |
|---|---|---|
| No guards or devices provided | 135 | 34.9 |
| Guards or devices provided but not used | 50 | 12.9 |
| Guards or devices provided and used but protection not adequate | 96 | 24.9 |
| Guards or devices improperly adjusted, maintained or installed | 59 | 15.2 |
| Set up, test operating and repairing | 49 | 12.6 |

Hart, "Power Press Accidents—A Management Problem," Metal Stamping, July, 1969, at 16.

In this study, a sizeable majority of the accidents occurred on machines equipped with safety guards and devices.

**32.** Because the Secretary's revised regulation upgrades device and guarding requirements, *see* note 9, *supra*, we cannot say that the Liberty Mutual Insurance Company Study is inconsistent with the Secretary's position. For example, 25 of the 389 injuries examined in the Study occurred on machines equipped with sweep devices. *See* Hart, "Power Press Accidents—A Management Problem," Metal Stamping, July, 1969, at 17. The Secretary's revised regulation prohibits the use of sweep devices. *See* note 9 *supra*.

**33.** *See, e. g.,* note 30 *supra*.

supported by substantial evidence. Again, the relevancy of this determination will be discussed below.

(4) *"No hands in dies" will create additional health and safety hazards.*

The evidence suggests that the alternatives to hand feeding are automatic or semi-automatic feeding or manual feeding by hand tools. The Secretary found that the use of automated feeding systems would expose operators to another source of injury—the feeder. There is testimony that some pinch-point accidents at feeding machines could cause amputations (a common result of power press accidents) as well as injuries of a less serious variety. There is evidence, moreover, that manual feeding with hand tools is not highly productive and would often be ignored by piece-rate press operators.[34] The Secretary's determination that no hands in dies would expose power press operators to additional safety hazards is supported by substantial evidence. This determination must, of course, be related to finding (3) above that there indeed exists an adequate alternative to such a standard.

(5) *Universal implementation of the no hands in dies standard is technologically impossible.*

There is evidence that automated feeding is at the present level of technology incompatible with as much as 47% of all power press operations.[35] Some stock is too large, too small, too bulky or too flimsy for mechanized handling. Other types of stock—with unusual configurations or special coating and finishing, for example—simply cannot be accommodated on many power presses now in operation. The use of hand tools appears to be impossible for some very large and very small stock, which may be incompatible with automated feeders as well.

Indeed, petitioner does not seriously dispute the substantiality of the evidence supporting this finding. As developed more fully in Part IIB(1) of this opinion, petitioner vigorously disputes that OSHA permits the Secretary in setting standards to take into account considerations of technological feasibility.

(6) *The economic costs associated with no hands in dies are prohibitive.*

There is abundant evidence that the implementation of the "no hands in dies" standard would be enormously costly in the gigantic metal stamping industry, and would probably result in the elimination of many mechanical power press job shops and a substantial loss of jobs. As with the finding on technological feasibility, petitioner does not seriously dispute the substantiality of this evidence, and principally confines his objection to the finding's relevance under OSHA.

■ We conclude that each of the Secretary's reasons for his departure from the no hands in dies standard, whatever its legal merit may be, is supported by substantial evidence in the record as a whole. Thus we now address petitioner's legal challenges.

**B. Relevancy of the Secretary's Reasons**

Petitioner contends that the Secretary's reliance on technological and economic infeasibility, even though his findings to that effect are supported by substantial evidence, was impermissible in standard setting proceedings under OSHA.

(1) *Technological infeasibility*

■ Acknowledging that for many applications the no hands in dies standard is technologically infeasible, and that the result of its universal application will be

---

**34.** In view of the evidence that feeding with hand tools would drastically diminish productivity, *see* note 28 *supra*, that method may not be a viable alternative to hands in dies or automated feeding.

**35.** Although there is evidence attesting to the accuracy of this figure we express no opinion about its correctness. We merely hold that there is substantial evidence to support the Secretary's finding of fact that compliance with a no hands in dies standard is not universally attainable in the immediate future.

the elimination of some businesses and some jobs, petitioner urges that this is exactly the result the Congress sought to accomplish. Neither this court nor, so far as our research discloses any other court, has construed OSHA in so Procrustean a fashion. Undoubtedly the most certain way to eliminate industrial hazards is to eliminate industry. But the congressional statement of findings and declaration of purpose and policy in § 2 of the Act shows that the upgrading of working conditions, not the complete elimination of hazardous occupations, was the dominant intention.[36] In an enforcement context we have noted that while Congress in enacting OSHA intended to reduce the number of workplace injuries, it did not intend to impose strict liability on employers for unavoidable occupational hazards. *Brennan v. OSHRC,* 502 F.2d 946, 951 (3d Cir. 1974). We do not question that there are industrial activities involving hazards so great and of such little social utility that the Secretary would be justified in concluding that their total prohibition is proper if there is no technologically feasible method of eliminating the operational hazard. But although Congress gave the Secretary license to make such a determination in specific instances, it did not direct him to do so in every instance where total elimination of risk is beyond the reach of present technology. Section 6(b)(5) of the Act, dealing with standards for toxic materials, explicitly confines the Secretary's rulemaking authority within technologically feasible boundaries.[37] *See Society of Plastics Industry, Inc. v. OSHA,* 509 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1988, 44 L.Ed.2d 482 (1975). If the Secretary may consider technological feasibility with respect to the elimination of hazards from toxic materials, then a fortiori he must be permitted to do so with respect to other hazards under the more general language of § 6(a).

■■ Although we hold that the Secretary may, consistent with the statute, consider the technological feasibility of a proposed occupational health and safety standard promulgated pursuant to § 6(a), we agree with the Second Circuit in *Society of Plastics Industry, Inc. v. OSHA, supra,* that, at least to a limited extent, OSHA is to be viewed as a technology-forcing piece of legislation.[38] Thus the Secretary would not be justified in dismissing an alternative to a proposed health and safety standard as infeasible when the necessary technology looms on today's horizon. Nevertheless, we are satisfied that the Secretary in this case

---

**36.** 29 U.S.C. § 651(a)–(b) states:

(a) The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments.

(b) The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . ..

**37.** 29 U.S.C. § 655(b)(5) provides:

The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life. Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

**38.** *Cf. Chrysler Corp. v. Department of Transp.,* 472 F.2d 659, 674 (6th Cir. 1972); *Natural Resources Defense Council, Inc. v. EPA,* 489 F.2d 390, 401 (5th Cir. 1974) (construing the 1970 amendments to the Clean Air Act).

has placed this factor in its proper perspective. The Secretary found, and we believe there is substantial evidence to support such a finding, that compliance with no hands in dies is not technologically feasible in the "near future." This finding necessarily implies consideration both of existing technological capabilities and imminent advances in the art. We do not believe that the Act imposes any heavier obligation.

### (2) *Economic infeasibility*

■ This court has not yet considered whether OSHA permits the Secretary, in adopting standards, to take into account the likely economic impact of those standards. The text of the statute does not address the point specifically, and the legislative history is at best cloudy. In *Industrial Union Department, AFL-CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467 (1974), Judge McGowan addresses the issue:

> There can be no question that OSHA represents a decision to require safeguards for the health of employees even if such measures substantially increase production costs. This is not, however, the same thing as saying that Congress intended to require immediate implementation of all protective measures technologically achievable without regard for their economic impact. To the contrary, it would comport with common usage to say that a standard that is prohibitively expensive is not "feasible". Senator Javits, author of the amendment that added the phrase in question to the Act, explained it in these terms:

> > As a result of this amendment the Secretary, in setting standards, is expressly required to consider feasibility of proposed standards. This is an improvement over the Daniels bill, which might be interpreted to require absolute health and safety in all cases, regardless of feasibility, and the Administration bill, which

contains no criteria for standards at all.

S.Rep.No.91–1282, 91st Cong., 2d Sess., at 58; Legis.Hist. at 197.

> The thrust of these remarks would seem to be that practical considerations can temper protective requirements. Congress does not appear to have intended to protect employees by putting their employers out of business—either by requiring protective devices unavailable under existing technology or by making financial viability generally impossible.

> This qualification is not intended to provide a route by which recalcitrant employers or industries may avoid the reforms contemplated by the Act. Standards may be economically feasible even though, from the standpoint of employers, they are financially burdensome and affect profit margins adversely. Nor does the concept of economic feasibility necessarily guarantee the continued existence of individual employers. It would appear to be consistent with the purposes of the Act to envisage the economic demise of an employer who has lagged behind the rest of the industry in protecting the health and safety of employees and is consequently financially unable to comply with new standards as quickly as other employers. As the effect becomes more widespread within an industry, the problem of economic feasibility becomes more pressing. For example, if the standard requires changes that only a few leading firms could quickly achieve, delay might be necessary to avoid increasing the concentration of that industry. Similarly, if the competitive structure or posture of the industry would be, otherwise adversely affected—perhaps rendered unable to compete with imports or with substitute products—the Secretary could properly consider that factor. These tentative examples are offered not to illustrate concrete instances of economic unfeasibility but rather

to suggest the complex elements that may be relevant to such a determination.[25]

[25] Since technological progress is here linked to objectives other than the traditional competitive, profit-oriented concerns of industry, accommodations of both sets of values will sometimes involve novel economic problems. International Harvester Co. v. Ruckelshaus, 155 U.S. App.D.C. 411, 478 F.2d 615 (1973), illustrates some of these problems in the context of the automobile emissions standards of the Clean Air Act. 42 U.S.C. § 1857 et seq. In the highly concentrated automobile industry the court deemed it likely that, by virtue of their size and importance to the economy, any one of the three major companies could obtain a relaxation of the automobile emissions standards if it could not meet them. If this occurred after other manufacturers had prepared to comply with the standard, the technological laggard would enjoy a competitive advantage because installation of the control devices renders the vehicles less efficient to operate. This circumstance justified insuring that the standards could be met by all major producers before they became effective.

Id. at 477–78 (some footnotes omitted). Judge McGowan has, we believe, arrived at a proper construction of the statute. Congress did contemplate that the Secretary's rulemaking would put out of business some businesses so marginally efficient or productive as to be unable to follow standards otherwise universally feasible.[39] But we will not impute to congressional silence a direction to the Secretary to disregard the possibility of massive economic dislocation caused by an unreasonable standard. An economically impossible standard would in all likelihood prove unenforceable, inducing employers faced with going out of business to evade rather than comply with the regulation. The Act does vest the Secretary with authority to enforce his

regulations,[40] but the burden of enforcing a regulation uniformly ignored by a majority of industry members would prove overwhelming. We therefore conclude that the Secretary may in the weighing process consider the economic consequences of his quasi-legislative standard-setting. We reject the petitioner's contrary contention.

## C. Adequacy of the Statement of Reasons

■■■ Although the statement of reasons quoted in note 26 supra in most respects satisfies the requirements of Synthetic Organic I, in this instance, because the Secretary's standard substantially differs from a national consensus standard, we have indicated that § 6(b)(8) imposes a specific additional requirement. The Secretary must disclose the reasons why his rule will better effectuate the purposes of the Act. We have found that the six reasons listed by him are supported by substantial evidence. We do not, however, find that they adequately disclose why his rule will better effectuate OSHA's purposes.

What the Secretary has done in setting forth his reasons is to assume, contrary to the text of ANSI Standard B 11.1–1971, that no hands in dies on the one hand and guards and devices on the other are alternative rather than cumulative approaches to the elimination of point of operation injuries. Thus while it may be true that no hands in dies alone will not prevent employees from placing their hands in the point of operation, it is not true that coupled with guards or devices the standard would not eliminate the practice. Simi-

---

**39.** Although many employers in all industries have demonstrated an exemplary degree of concern for health and safety in the workplace, their efforts are too often undercut by those who are not so concerned. Moreover, the fact is that many employers—particularly smaller ones—simply cannot make the necessary investment in health and safety, and survive competitively, unless all are compelled to do so. The competitive disadvantage of the more conscientious employer is especially evident where there is a long period between exposure to a hazard and manifestation of an illness. In such instances a particular employer has no economic incentive to invest in current precautions, not even in the reduction of workmen's compensation costs, because he will seldom have to pay for the consequences of his own neglect.

S.Rep.No.91–1282, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News 5180.

**40.** 29 U.S.C. § 659.

larly, while it may be true that a statistical comparison of no hands in dies operations with operations guarded by approved guards and devices produces inconclusive results, the comparison is hardly relevant to a standard involving redundant safeguards. Certainly the finding that guards and devices provide effective protection is relevant, as is the finding that use of automatic or semi-automatic feeders introduces additional hazards. But what is lacking, since the Secretary seems to have taken an "either-or" approach, is any comparison of the net safety effect of a redundant requirement. It may well be that the pinch-point hazards of automatic feeders is slight in comparison with the safety gains from no hands in dies operation. There is, however, no finding to this effect.

The same "either-or" defect appears with respect to the Secretary's discussion of technological and economic feasibility. Granted that *universal* application of the no hands in dies standard is not technologically or economically feasible, it does not follow that a *universal* departure from the national consensus standard would better effectuate the purposes of OSHA. Certainly the record suggests that there are many mechanical power press applications in which the no hands in dies standard will be both technologically and economically feasible. Nowhere does the Secretary discuss the reason why a partial departure from the national consensus standard would be inappropriate. Nowhere does he discuss the possibility of utilizing the variance procedures of § 6(b)(6), 29 U.S.C. § 655(b)(6) for relief in specific instances of infeasibility. There may be adequate reasons for rejecting either approach, but we do not know them. Unless they are disclosed we cannot properly perform our reviewing function.

### III. Conclusion

We conclude that the Secretary's statement of reasons does not adequately disclose why the rule he adopted will better effectuate the purposes of OSHA than would the national consensus standard which it supplants. The cause will be remanded to the Occupational Safety and Health Administration of the Department of Labor for the preparation of a more complete statement of reasons in accordance with this opinion.